**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TRAVIS HALL, executor of the estate of )
DONALD R. HALL, deceased, )
                                )
                Plaintiff )
                                )
           v. )        Civil Action No. 22-cv-1165
                                )        Judge Nora Barry Fischer
LIGONIER VALLEY POLICE DEPARTMENT, )
DANIEL DORAZIO, )
MATTHEW E. SHERER, )
THOMAS J. KOKOSKA, )
BRUCE A. WADSWORTH, )
LIGONIER LANES, INC. d/b/a )
        Wicked Googly, and )
LOYALHANNA ASSOCIATION, )
                                )
             Defendants. )

## MEMORANDUM OPINION

I. INTRODUCTION

      Plaintiff, Travis Hall ("Plaintiff"), Executor of the Estate of Donald R. Hall ("Donald Hall" or "Hall"), brings this civil action pursuant to 42 U.S.C. § 1983 and the theory of state-created danger against Defendants Ligonier Valley Police Department ("LVPD"), Daniel Dorazio ("Dorazio"), and Matthew E. Sherer ("Sherer") (collectively "LVPD Officers"). Plaintiff further claims that Defendant Thomas J. Kokoska ("Kokoska"), conspired with the LVPD Officers to subject Hall to a state-created danger, all resulting in a single motor vehicle accident involving the decedent, Donald Hall. (Amended Compl., ECF No. 64 at Counts I & II). Plaintiff also brings supplemental state law claims against Dorazio, Sherer, Kokoska, Defendant Bruce A. Wadsworth ("Wadsworth"), Ligonier Lanes, Inc. d/b/a Wicked Googly ("Ligonier Lanes" or "Wicked Googly"), and Defendant Loyalhanna Association ("Loyalhanna"). (*Id.* at Counts III-IX).

Presently before the Court are Motions for Summary Judgment filed by the LVPD and LVPD Officers (ECF No. 117), Defendants Kokoska and Loyalhanna (ECF No. 113), and Ligonier Lanes (ECF No. 119) on all Counts with supporting documentation.  (ECF Nos. 113, 114, 116, 117, 119, 120, 121).  Plaintiff filed a response to the Motions with supporting documentation. (ECF Nos.123, 124, 125, 126, 127, 131, 132, 133).  Defendants filed replies to Plaintiff's responses.  (ECF Nos. 135, 136, 137).  Plaintiff filed sur-replies to each of Defendants' replies. (ECF Nos. 138, 139, 140)  The matter is fully briefed.

Having considered the parties' positions and evidence in accordance with the standard governing motions for summary judgment, for the following reasons, the Court will grant the motions for summary judgment as to Plaintiff's § 1983 state-created danger and conspiracy claims against the LVPD, the LVPD Officers, and Kokoska at Counts I and II, and decline to exercise supplemental jurisdiction over the remaining state law claims at Counts III-IX pursuant to 28 U.S.C. § 1367(c)(3).

## II.  FACTUAL BACKGROUND

The following facts are taken from the parties' Concise Statements of Material Facts and responses thereto (ECF Nos. 121, 133, 116, 125), and from the fact section of Kokoska and Loyalhanna's Motion for Summary Judgment (ECF No. 113) and Plaintiff's response.[1] (ECF No. 131). These facts are undisputed unless otherwise indicated.

---

[1] Defendants Kokoska and Loyalhanna did not file a Concise Statement of Material Facts as required by Local Civil Rule 56 for the Western District of Pennsylvania.  In its absence, the Court relies on the facts contained within their Motion for Summary Judgment (ECF No. 113 ¶¶ 1-34) and Plaintiff's responses to those facts (ECF No. 131 ¶¶ 1-34).  *See Scalia v. WPN Corp.,* 417 F. Supp. 3d 658, 661 (W.D. Pa. 2019) (noting deficiencies in following the Local Rules and "rely[ing] on the record as a whole to determine the applicable material facts . . . ."); *cited in, King v. Pa. Dep't of Corrs.*, Civil Action No. 18-1245, 2020 WL 2897019, at *1 (W.D. Pa. June 1, 2020) ("The Court [] has discretion to consider evidentiary materials in the record beyond the parties' concise statements and responses thereto.").

On November 2, 2020, at approximately 6:30 p.m., Donald Hall arrived at the Wicked Googly, a restaurant and bar located in Ligonier, Pennsylvania. (ECF Nos. 121 & 133 ¶ 4). Heather Tinkey ("Tinkey"), Hall's ex-girlfriend, was also at the Wicked Googly that evening. (*Id.* ¶ 6). Hall contacted Tinkey several times earlier that day, sent her a drink at the Wicked Googly, and spoke with her several times while at the bar in an apparent attempt to rekindle their romance. (*Id.* ¶ 7). Tinkey left the Wicked Googly at approximately 9:30 p.m. (*Id.* ¶ 8).

After arriving home and getting ready for bed, Tinkey heard Donald Hall yelling and beating on her door. (*Id.* ¶ 10). She called 9-1-1 at 10:43 p.m. (*Id.* ¶¶ 11-12). Defendant Officer Dorazio of the LVPD, who received the dispatcher's call at approximately 10:45 p.m., responded to the request for police assistance at Tinkey's residence. (*Id.* ¶¶ 13-14). At the time the call came in, Defendant Kokoska, a patrolman with the Loyalhanna Association, Inc., was staging on Weaver Mill Road to assist Dorazio. (ECF Nos. 116 & 125 ¶ 26). Kokoska overheard the call come in and asked whether Dorazio needed assistance. Dozario responded in the affirmative. (*Id.* ¶ 27). During the dispatch call from Tinkey, Defendant LVPD Officer Sherer and LVPD Officer Alex Barber ("Barber") came on shift. (*Id.* ¶ 28). Eventually, Officers Barber and Sherer arrived at Tinkey's property and assisted in the investigation. (ECF Nos. 113 & 131 ¶ 17).

Upon arrival to the Tinkey residence at approximately 10:58 p.m., Dorazio observed Donald Hall sleeping in the driver's seat of his black GMC truck. The vehicle was not running, and the vehicle's lights were not illuminated. (ECF Nos. 121 & 133 ¶¶ 15-16).

Tinkey wanted Donald Hall off her property. (ECF Nos. 113 & 131 ¶ 20). Tinkey, however, did not want Hall to be criminally charged. (ECF Nos. 116 & 125 ¶¶ 45, 62). A portable breath test on Hall registered .19. (ECF Nos. 121 & 133 ¶ 37; ECF Nos. 113 & 131 ¶ 20). The LVPD Officers would not allow Hall to drive while intoxicated, so Dorazio offered him the option

3

to call a friend to take care of him. (ECF Nos. 113 & 131 ¶¶ 21-22; ECF Nos. 116 & 125 ¶ 60). After a discussion with Hall about who to contact, Barber, using Hall's phone, contacted Defendant Wadsworth to take custody of Hall. (ECF Nos. 116 & 125 ¶¶ 66-67). Around this time, Officers Barber and Sherer left Tinkey's property to investigate another call. (ECF Nos. 113 & 131 ¶ 24).

Officer Dorazio spoke to Wadsworth on the phone. (ECF Nos. 121 & 133 ¶ 43; ECF Nos. 113 & 131 ¶ 23). Dorazio testified that he told Wadsworth that there was an incident at Tinkey's house involving Hall, and that Tinkey wanted Hall off her property. Dorazio further explained that Hall was unable to operate his vehicle and asked if Wadsworth was able to take care and custody of him for the evening.[2] (ECF Nos. 121 & 133 ¶ 44). Based upon his conversation with Wadsworth on the phone, Dorazio determined that Wadsworth appeared to be sober and willing to care for Hall that evening.[3] (Id. ¶ 46). Wadsworth agreed to pick up Hall at a local Sheetz convenience store. (ECF Nos. 121 & 133 ¶ 47).

Officers asked Hall if they could move his vehicle from Tinkey's property. (ECF Nos. 121 & 133 ¶¶ 48-49). The parties dispute whether Hall consented and whether he had the ability to consent. (ECF Nos. 121 & 133 ¶ 50; ECF Nos. 116 & 125 ¶ 68). Defendant Kokoska moved Hall's vehicle to Barb's Country Store in the town of Rector. (ECF Nos. 116 & 125 ¶ 68).

Thereafter, Hall was transported to Sheetz by Dorazio. (Barber Dep., ECF No. 122-1 at 986, p. 94). At the Sheetz parking lot, Officers Dorazio and Barber told Wadsworth that Hall was intoxicated, that Wadsworth was to take him to his (Wadsworth's) house, and that Hall was not to

---

[2] The record suggests that Donald Hall was homeless and either living at a motel or sleeping in his car at a hotel. (ECF Nos. 121 & 133 ¶ 23; ECF Nos. 116 & 125 ¶ 52).

[3] Wadsworth had been with Donald Hall earlier that evening at the Wicked Googly. (ECF Nos. 121 & 133 ¶ 42). Wadsworth testified that he ordered a Coors Light while at the Wicked Googly, along with cheese balls and "loaded fries," which he shared with his wife. (Wadsworth Dep., ECF No. 122-1 at 39-40, p. 39-40). Later, he ordered another Coors Light. (Id. at 44, p. 44). Wadsworth testified that he had no other drinks at the Wicked Googly that evening, other than water, and that he gave Hall around $35 in cash to cover his and his wife's food, drinks, and tip, when leaving. (Id. at 52-54, pp. 52-54). Hall remained at the Wicked Googly after Wadsworth and his wife left. (Id. at 43, 54, pp. 43, 54).

drive his vehicle. (ECF Nos. 121 & 133 ¶¶ 63, 65); (Wadsworth Dep., ECF No. 122-1 at 67, p. 67). Wadsworth agreed to the Officers' directives. (ECF Nos. 121 & 133 ¶ 67).

Hall entered Wadsworth's white Tundra truck and told Wadsworth that he needed cigarettes. (*Id.* ¶¶ 69 & 70). Hall gave Wadsworth money and Wadsworth went into Sheetz to make the purchase. (*Id.* ¶ 71). When Wadsworth returned to his vehicle and gave Hall the cigarettes, Hall wanted to smoke in Wadsworth's truck. (*Id.* ¶ 72). Wadsworth told Hall that he was not permitted to smoke in his vehicle. (*Id.* ¶ 74). Hall became agitated and told Wadsworth that "he's not going to his effing house." (*Id.* ¶ 75). Wadsworth responded: "if that's what you want, then we'll go left. I'll take you back."[4] (*Id.* ¶ 77). Hall told Wadsworth where his vehicle was located while they were in the Sheetz parking lot. (*Id.* ¶¶ 78, 79). The Officers were still present in their vehicles at Sheetz when Hall refused to go to Wadsworth's house. (*Id.* ¶ 80).

Wadsworth drove Hall about 15 minutes to Rector to retrieve his vehicle in the parking lot of Barb's Country Store. (*Id.* ¶ 81). While driving Hall back to his truck, Wadsworth suggested that Hall "sleep it off" in his truck. (Wadsworth Dep., ECF No. 122-1 at 181, p. 181). Wadsworth admitted that he failed to carry out the instructions from the Officers to take Donald Hall to Wadsworth's home despite being explicitly instructed to do so. (ECF Nos. 116 & 125 ¶ 81; ECF Nos. 121 & 133 ¶ 83).

When Wadsworth and Hall arrived at the country store, Hall exited Wadsworth's vehicle. (ECF Nos. 121 & 133 ¶ 85). Wadsworth told Hall to go straight home. (*Id.* ¶ 86). Wadsworth left Barb's Country Store's parking lot and proceeded home. (*Id.* ¶ 89).

At this time, Defendant Kokoska saw Wadsworth's white Tundra truck in Barb's Country Store's parking lot. (*Id.* ¶ 90). Kokoska was concerned because Hall was under the influence of

---

[4] To travel to Wadsworth's house, a vehicle would have to make a right hand turn out of the Sheetz parking lot. ((ECF Nos. 121 & 133 ¶ 76).

alcohol.  (*Id.* ¶ 91).  He believed that he saw Hall's black GMC truck drive off.  (*Id.* ¶ 93).  He radioed Officer Barber that he saw the white Tundra truck in the parking lot of Barb's Country Store out of concern that the person who was supposed to be taking Hall home was dropping him back off at his vehicle.  (*Id.* ¶ 94).  Kokoska also radioed that Hall was operating his vehicle.  (*Id.* ¶ 95).  He was able to see a portion of the route that Hall was traveling and ultimately, came upon the accident scene, where Hall had been partially ejected from the driver-side window, (*id.* ¶ 96), and had suffered significant, life altering injuries.  (Amended Compl. ECF No. 64 ¶ 71).  Kokoska then radioed in that a black GMC truck had crashed into a tree.  (ECF Nos. 121 & 133 ¶ 97).

Approximately ten (10) minutes after he dropped Hall at his vehicle, Wadsworth was pulled over by Officer Barber who told him to follow him to the accident scene involving Hall.  (*Id.* ¶ 98).  Wadsworth told Barber that Hall was "giving him problems," that he was adamant that he be taken back to his car, and that he (Wadsworth) did not want to "deal with it."  (*Id.* ¶ 99).  Officer Barber asked Wadsworth if he was aware that the police were still in the Sheetz parking lot at the time Wadsworth turned left to take Hall back to his truck. Wadsworth told him that he was, "but he just did not give [Hall] back to [the Officers].  (*Id.*).  Wadsworth followed Officer Barber to the scene of the accident.  (*Id.* ¶ 100).

Two years after sustaining his catastrophic injuries, Donald Hall died on April 14, 2023.  (*Id.* ¶ 103).

## III.  PROCEDURAL BACKGROUND

Donald Hall, filed his Complaint on August 12, 2022.  (ECF No. 1).  With his death on April 14, 2023, the executor of his estate, Plaintiff Travis Hall, filed an Amended Complaint on June 2, 2023.  (ECF No. 64).  Plaintiff alleges two Counts pursuant to 42 U.S.C. § 1983 for violation of Hall's Fourteenth Amendment due process rights pursuant to the state-created danger

theory against the LVPD, and the LVPD Officers.  (*Id.* at Count I).  As to Kokoska, Plaintiff alleges a claim for conspiracy to subject Donald Hall to a state-created danger.  (*Id.* at Count II).  Sherer and Dorazio are named in their official and individual capacities.  (*Id.* ¶¶ 5, 8).

Plaintiff also brings supplemental state law claims against Dorazio and Sherer for false imprisonment and trespass to chattel, (*id.* at Counts III & IV, respectively), and a state law claim against Kokoska for trespass to chattel (*id.* at Count IV).  Plaintiff includes additional supplemental state law claims for negligence in Counts V, VII and VIII against Kokoska, Wadsworth, and Ligonier Lanes, respectively.  Plaintiff also alleges a state law claim for *respondeat superior* liability against Loyalhanna (*id.* at Count VI), and a claim against Ligonier Lanes pursuant to the Dram Shop Act, § 4-493 of the Pennsylvania Liquor Code (*id.* at Count IX).

A motion to dismiss for lack of jurisdiction, filed by Ligonier Lanes (ECF No. 17), was denied, without prejudice, on December 13, 2022.  (ECF No. 33).  Along with their Answers to the Amended Complaint, Defendants filed cross claims.  (ECF Nos. 65, 66, 67, & 74).  The case did not resolve in ADR.  (ECF No. 68).

After completing discovery, all Defendants filed Motions for Summary Judgment except Wadsworth.  (ECF Nos. 113, 117 & 119).  As noted, briefing is complete.

## IV.  LEGAL STANDARD

Summary Judgment is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a).  A genuine dispute of material fact is one that could affect the outcome of the litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson,* 477 U.S. at 248).  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."

*N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine,

triable issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden,

the non-moving party must present sufficient evidence of a genuine issue, in rebuttal. *Santini v.*

*Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587).

When considering the parties' arguments, the court is required to view all facts and draw all

inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold,*

*Inc.*, 369 U.S. 654, 655 (1962)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where

the non-moving party merely reasserts factual allegations contained in pleadings. *Betts v. New*

*Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West*

*Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits,

depositions testimony, admissions, and/or interrogatories to demonstrate the existence of a genuine

issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing

*Celotex Corp.*, 477 U.S. at 324).

V. DISCUSSION

<u>Section 1983 and State-Created Danger</u>

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or any other person within the jurisdiction thereof to
> the deprivation of any rights, privileges, or immunities secured by
> the Constitution and laws, shall be liable to the party injured in an

> action at law, suit in equity, or other proper proceeding for redress .
> . . .

42 U.S.C. § 1983.  To state a claim for relief under this provision, a plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States.  *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994).  Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

In *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), the United States Supreme Court noted that generally, the Due Process Clause of the Fourteenth Amendment to the United States Constitution does not impose an affirmative duty upon the State to protect citizens from the acts of private persons.  *Id*. at 198-200.  There, the Court rejected the argument of a boy and his mother that local officials, who had repeatedly attempted to ensure the boy's safety from his abusive father, were liable under the "special relationship" theory when the boy remained in his father's custody and was so badly beaten that the boy suffered severe brain damage.  *Id*. at 195-96.  In rejecting plaintiffs' argument pursuant to the "special relationship" theory, the Court stated that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *Id*. at 199-200.  The Court continued its analysis with the following dicta that provided the foundation for the "state-created danger" theory of liability:

> While the State may have been aware of the dangers Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.  That the State

once took temporary custody of Joshua does not alter the analysis,
for when it returned him to his father's custody, it placed him in no
worse position than that in which he would have been had it not
acted at all; the State does not become the permanent guarantor of
an individual's safety by having once offered him shelter.  Under
these circumstances, the State had no constitutional duty to protect
Joshua.

*Id*. at 201.

In *Kneipp*, the United States Court of Appeals for the Third Circuit relied on the above
language in *DeShaney* to recognize that a plaintiff alleging a substantive due process violation
pursuant to 42 U.S.C. § 1983 could proceed in accordance with a state-created danger theory where
a State does play a part in the creation of the dangers faced by a private person, or where through
its actions, the State renders the individual more vulnerable to them.  *Kneipp*, 95 F.3d 1199, 1205,
1211 (3d Cir. 1996).  As such, the court of appeals held that police officers could be liable for a
wife's serious injuries where the police officers stopped the husband and wife, permitted the
husband to leave, and left the visibly and severely intoxicated wife out in the cold to fend for
herself.  *Id.*

Since *Kneipp*, the Third Circuit has recognized the following four elements of a state-
created danger claim:

> 1) the harm ultimately caused was foreseeable and fairly direct;
>
> 2) a state actor acted with a degree of culpability that shocks the
> conscience;
>
> 3) a relationship between the state and the plaintiff existed such that
> the plaintiff was a foreseeable victim of the defendant's acts, or a
> member of a discrete class of persons subjected to the potential harm
> brought about by the state's actions, as opposed to a member of the
> public in general; and

> 4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sanford v. Stiles*, 456 F.3d 298, 304-05 (3d Cir. 2006) (quoting *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and footnotes omitted)).   All four elements must be satisfied to prove said claim.  *Id*.

A.  <u>Section 1983 State Created-Danger Claim Against Dorazio and Sherer in Their Individual Capacities</u>

The LVPD Officers argue that they are entitled to judgment as a matter of law because the undisputed facts of record show that Plaintiff cannot establish elements one (1), two (2) and four (4) of the state-created danger analysis.  (LVPD Defendants' Brief in Support of Summary Judgment, ECF No. 118 at 5-8).  In distinguishing the facts at bar from those in *Kneipp*, they contend that the record demonstrates that they went to great lengths to ensure Donald Hall's safety such that the harm to Hall was neither foreseeable nor fairly direct.  They note that Hall was living at a motel alone and state that he would have been alone in his inebriated state if taken there.  (*Id.* at 5.)  They add that individuals suspected of DUI in Westmoreland County are not taken to jail under any circumstances.  (*Id.*)  Accordingly, Defendants emphasize that they contacted Wadsworth to pick up Hall with the understanding that Hall would go home with Wadsworth, and they specifically instructed Wadsworth to not allow Hall to return to his vehicle.  (*Id.* at 6.)  The LVPD Officers contend that it was not foreseeable that Wadsworth would take Hall back to his truck.  (*Id.*)  As to the second element, Defendants argue that the LVPD were acting in a hyper-pressurized environment, given the historical relationship between Tinkey and Hall, and therefore, cannot be found to have acted with intent to harm under these facts.  (*Id.* at 7-8.)  As to the fourth element of a state-created danger claim, Defendant Officers assert that they affirmatively did not

use their authority to create a danger to Hall or otherwise render him more vulnerable to danger had they not acted at all, pointing to Hall's many voluntary and independent decisions the evening of the accident that placed him in harm's way. (*Id.* at 6-7.) Finally, they argue that the only basis of liability pled against the LVPD is *respondeat superior*, which is not a basis for liability pursuant to § 1983. (*Id.* at 8.)

As to the first element of the state-created danger test, Plaintiff's response focuses on "the steps the LVPD Defendants *failed to take* to ensure [Hall's] safety." (Plaintiff's Responsive Brief, ECF No. 124 at 8) (emphasis added). Specifically, he contends that the LVPD Defendants "failed to arrest and incarcerate" Hall; "failed to impound [Hall's] vehicle after ascertaining it as unregistered," and "made no investigation into Wadsworth's sobriety or responsibility." (*Id.* at 8). Plaintiff next argues that because they had over an hour to determine how to handle the circumstances they confronted, the Officers engaged in "unhurried judgments" and "careful deliberation," focused not on Hall's safety, but on how to avoid "having to detain Hall and the paperwork assuredly to follow." (*Id.* at 9-11). Concerning the third element, Plaintiff asserts that because the LVPD Officers placed Hall in handcuffs in the back of a squad car, and transported him miles from the initial location, they created a special relationship with Hall such that he was a foreseeable victim of their actions. (*Id.* at 11-12). Finally, Plaintiff maintains that because of the Defendants' omissions in failing to arrest Hall; in failing to perform an investigation to ensure that Wadsworth was sober and responsible; in failing to take Hall's keys; in failing to impound his vehicle, and subsequently releasing him with his keys on his person, Defendants created a danger to Hall that he otherwise would not have confronted. (*Id.* at 13).

The Court addresses each of these arguments *seriatim*.

    1. <u>The harm to Hall was not foreseeable, nor fairly direct</u>

First, as to foreseeability, record evidence must demonstrate that "officials were actually aware, and thus on notice of the risk of harm." *Dorley v. South Fayette Twp. Sch. Dist.,* 129 F. Supp. 3d 220, 233 (W.D. Pa. 2015) (citing *Henry v. City of Erie,* 728 F.3d 275, 282 (3d Cir. 2013)). *See also Gremo v. Karlin,* 363 F. Supp. 2d 771, 784 (E.D. Pa. 2005) ("Under Third Circuit jurisprudence, a harm is foreseeable when a state actor has actual awareness, based on concrete information of a risk of harm to an individual or class of individuals such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm."). "Fairly direct" refers to actions that cannot be "separated from the ultimate harm by a lengthy period of time and intervening forces and actions." *Dorley,* 129 F. Supp. 3d at 233 (citing *Henry*, 728 F.3d at 285). This factor generally addresses whether the harm caused was "'too attenuated' to justifiably hold the defendant liable." *Id.* (quoting *M.U. v. Downingtown High Sch. East,* 103 F. Supp. 3d 612, 621 (E.D. Pa. 2015)).

Here, the undisputed facts of record reflect that the harm to Donald Hall was not foreseeable. In an effort to protect the intoxicated Hall, Officer Barber testified that he asked Hall if he had a friend who would be willing to take custody of him. (Barber Dep., ECF No. 122-1 at 980, p. 88). Officer Barber also stated that if they had taken Hall back to the motel, he would have been alone in his inebriated state with no sober adult to care for him. (*Id.* at 960, p. 68). The parties agree that individuals suspected of DUI and certain other misdemeanors in Westmoreland County are not taken to jail under any circumstances. (ECF Nos. 116 & 125 ¶ 72). Officer Barber testified that because the LVPD is a two-man operation on any one shift, that generally, those suspected of DUI are turned over to the custody of a sober adult and officers "go from there." (Barber Dep., ECF No. 122-1 at 981, p. 89). Barber continues: "For DUIs, in Westmoreland County at least, we don't take them to jail. Just how it is. And then any other summary crimes,

depending which misdemeanors, just like DUI, we don't take them to jail." (*Id.*).  Accordingly, Barber and Dorazio met with Wadsworth at Sheetz and determined that Wadsworth exhibited no characteristics to suggest that further investigation into Wadsworth's sobriety was necessary, even though Hall had indicated that Wadsworth was drinking with him at the Wicked Googly.  (*Id.* at 999-1000, p. 107-08).  Plaintiff advocates that "[t]o allege that it was unforeseeable that another intoxicated person would not be responsible enough to ensure the safety of an intoxicated person is, even on its own, an assertion that shocks the conscience." (Plaintiff's Responsive Brief, ECF No. 124 at 8).  However, the Court finds that there is absolutely no evidence of record that Wadsworth was intoxicated when he took custody of Hall, nor does Plaintiff provide a citation to the record to support his assertion that suggests Wadsworth was intoxicated at that time.  (*See* ECF No. 124 at 8).

Similarly, the record lacks evidence suggesting that Wadsworth would not follow the Officers' directives to transport Hall to Wadsworth's home, and to not allow Hall to drive his vehicle that evening.  Dorazio specifically asked Wadsworth if he was uncomfortable taking custody of Hall, or if he thought there was going to be an issue in dealing with Hall.  Wadsworth responded "no." (Dorazio Dep., ECF No. 122-1 at 625, p. 176).  As a precaution, Dorazio stayed at the Sheetz in case Wadsworth changed his mind or couldn't handle Hall.  (*Id.* at 629, p.180).  When Wadsworth was questioned as to why he did not return Hall to the Officers who were still in the Sheetz parking lot after Hall became belligerent, Wadsworth responded: "It never crossed my mind until later . . . ." (Wadsworth Dep., ECF No. 122-1 at 188, p.188).  At bottom, there was simply no obvious risk in handing Plaintiff over to Wadsworth such that the LVPD Officers should have known of the danger in doing so.

14

Moreover, record evidence also supports the fact that the harm to Hall was not fairly direct. That is, the harm flowed from the intervening actions of Wadsworth rather than from the actions of the LVPD Officers.  The LVPD Officers had no reason to suspect that Wadsworth would not follow their directives.  Consequently, Plaintiff is unable to satisfy the first part of the state-created danger test.

### 2.  The actions of the LVPD Officers do not shock the conscience

For an official's action to shock the conscience, the action "must be more egregious than 'negligently inflicted harm,' as mere negligence 'is categorically beneath the threshold of constitutional due process.'"  *Haberle v. Troxell*, 885 F.3d 170, 177 (3d Cir. 2018) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).  The standard is met by "'only the most egregious official conduct . . . .'"  *Id.* (quoting *Cnty. of Sacramento*, 523 U.S. at 846).  "The exact level of culpability required to shock the conscience . . . depends on the circumstances of each case, and the threshold for liability varies with the state actor's opportunity to deliberate before taking action."  *Kedra v. Schroeter,* 876 F.3d 424, 437 (3d Cir. 2017).  The United States Court of Appeals for the Third Circuit has identified three levels of potential culpability.  In a "hyperpressurized" environment requiring instantaneous decision-making, liability will arise only where the official intends to cause the harm.  *Id.* (citation omitted). Where the official has hours or minutes before he is required to act, the state actor must "disregard a great risk of serious harm." *Id.* (citation omitted).  *See also Haberle,* 885 F.3d at 177 (situations involving "hurried deliberations" requiring decisions that need to be made "in a matter of hours or minutes").  Finally, where the actor has time to make an "unhurried judgment," a plaintiff must show only "facts supporting an inference that the official acted with a mental state of 'deliberate indifference.'" *Kedra,* 876 F.3d at 437 (citation omitted).  In *Kedra*, the court of appeals described deliberate

indifference as "conscious disregard of a substantial risk of serious harm," or "willful disregard" evidenced by actions of the official showing "a willingness to ignore a foreseeable danger or risk." *Id.* (internal citations omitted).  Recognizing the "elusive quality" of the deliberate indifference culpability standard, the court concluded that it exists somewhere between intent and negligence and should be assessed by an objective standard in the context of a state-created danger due process violation.  *Id.* at 437-39 (citing *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235 (3d Cir. 2016) (other internal citations omitted).  Deliberate indifference will also exist "when a risk of harm is so patently obvious that the party should have known of it."  *L.R.,* 836 F.3d at 246; *Keener v. Hribal*, 351 F. Supp. 3d 956, 972 (W.D. Pa. 2018) (other citation omitted).

Understandably, the LVPD Officers urge the Court to adopt the split-second standard, while Plaintiff argues for the unhurried judgment standard.  Construing all disputed facts in favor of the nonmoving Plaintiff on summary judgment, the record reflects that the actions of the LVPD Officers were taken under circumstances somewhere in the middle, requiring "hurried deliberation."  *See Haberle*, 885 F.3d at 177.  That is, they were confronted with circumstances that required decisions "in a matter of hours or minutes."  *See id.*  Although the LVPD Officers argue that they were proceeding under "hyperpressurized" circumstances given the historical relationship between Tinkey and Hall, the record reflects that, from the moment they found Hall passed out in his car at the Tinkey residence, until they delivered him to Wadsworth, they had some limited amount of time to consider how best to protect Hall.  Consequently, their actions will "shock the conscience" only if those actions reveal a conscious disregard of a "'great risk of serious harm rather than a substantial risk.'"  *See Haberle*, 885 F.3d at 177 (quoting *Sanford*, 456 F.3d at 310).

The LVPD Officers had a limited amount of time to locate an individual who would be willing to take custody of Hall so that he would not be a danger to himself or others. Their time for deliberation was limited by Tinkey's demand that Hall be removed from her property and the fact that more calls were coming in for the understaffed police department. *See* Sherer Dep., ECF No. 122-1 at 771, p. 69) (Barber and Sherer were called away from the scene at Tinkey's to another "domestic."). They simply did not have time for "casual deliberation."[5] *See Haberle,* 885 F.3d at 177. Upon identifying Wadsworth as a possible custodian for Hall, speaking with Wadsworth on the phone, and observing and speaking with him in person at Sheetz, Barber and Dorazio had no reason to believe that Wadsworth would place Hall in harm's way after their numerous admonitions to Wadsworth not to allow Hall to drive his truck. (Dorazio Dep., ECF No. 122-1 at 589-91, pp. 140-42; Barber Dep., ECF No. 122-1 at 990-94, pp. 98-102). Consequently, the LVPD Defendants cannot be said to have disregarded a great risk of serious harm.

Even if the circumstances warranted the application of the "unhurried judgments" standard by the LVPD Officers, their actions cannot be construed as deliberately indifferent to the safety of Donald Hall. The facts of record do not demonstrate that they consciously disregarded a substantial risk of serious harm. Upon personally questioning Wadsworth at Sheetz, Wadsworth showed no signs of intoxication. (Barber Dep., ECF No. 122-1 at 999-1000, p. 107-08). Moreover, Wadsworth did not communicate any equivocation in taking custody of Hall and transporting him to Wadsworth's home that evening. (Dorazio Dep., ECF No. 122-1 at 601, 625, pp. 152, 176). In fact, Wadsworth admitted that it was a bad decision to drive Hall back to his truck. (Wadsworth Dep., ECF No. 122-1 at 142, p. 142). These facts, taken as whole, do not reflect a willingness by the LVPD Officers to ignore a foreseeable risk of danger. *See* discussion, *supra* at IV.A.1 (The

---

[5] Because the LVPD is a two-man operation on any one shift, generally, those suspected of DUI and other summary offenses, are turned over to a responsible adult. (Barber Dep., ECF No. 122-1 at 981, p. 89).

harm to Hall was not foreseeable, nor fairly direct). Therefore, the undisputed facts of record demonstrate that the actions of the LVPD Officers do not shock the conscience under any standard, and Plaintiff is unable to meet the second element of the state-created danger test.

3. <u>The affirmative acts of the LVPD Officers did not create a danger to Hall, nor render him more vulnerable to the danger than had they not acted at all.</u>

In *Ye v. United States,* the Third Circuit stated the following regarding the conditions necessary to satisfy the fourth element of a state-created danger claim: "(1) a state actor exercised his or her authority, (2) the state actor took an affirmative action; and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." 484 F.3d 634, 639 (3d Cir. 2007). Here, the LVPD Officers argue that Plaintiff has failed to come forward with disputed issues of material fact to show that they used their authority to create an opportunity for the harm that eventually befell Hall. Instead, they argue that Hall made several voluntary decisions which created the danger. Plaintiff responds that Defendants acted affirmatively to render him more vulnerable to danger in the following ways:

- by detaining Hall rather than arresting him;

- in relinquishing Hall to Wadsworth without performing an investigation to ensure Wadsworth was sober at the time he took custody of Hall;[6]

- in failing to impound his unregistered vehicle as required by statute;

- in failing to allow Hall to continue to sleep in his car when they came upon him at Tinkey's residence;

- in informing Hall that his truck was moved from Tinkey's residence to Barb's Country Store; and

- in returning Hall's keys when he was given over to Wadsworth at Sheetz.

(Plaintiff's Response, ECF No. 124 at 13, Plaintiff's Sur-reply, ECF No. 138 at 2).

---

[6] Again, Plaintiff characterizes Wadsworth as an "intoxicated individual," but there is no record evidence to support Plaintiff's statement that Wadsworth was intoxicated at the time he took custody of Hall at the Sheetz.

Viewing the facts in the light most favorable to Donald Hall under the Third Circuit's analytical framework, the Court concludes that only three of these assertions constitute affirmative acts. The remainder are omissions. The Third Circuit rejects "attempts to redefine clearly passive inaction as affirmative acts." *Morrow v. Balaski,* 719 F.3d 160, 178 (3d Cir. 2013). "[A]n alleged failure *to do something,* standing alone, cannot be the basis for a state-created danger claim." *Johnson v. City of Philadelphia*, 975 F.3d 394, 401 (3d Cir. 2020) (emphasis in original) (citing *Burella v. City of Philadelphia,* 501 F.3d 134, 146-47 (3d Cir. 2007) (police officers' failure to intervene in domestic-violence situation did not satisfy element four)).

Here, according to Plaintiff, the LVPD Officers affirmatively acted three times. First, they informed Hall where his truck was located; this is undoubtedly an affirmative act. Second, Hall's keys were in his possession when Wadsworth delivered him to his truck at Barb's County Store. Returning Hall's keys is an affirmative act. Finally, the act of detaining, rather than arresting Hall, is arguably an affirmative act.

The other alleged acts, however, are failures to act. For example, Plaintiff argues that if the Officers had arrested Hall and taken him to jail, the ensuing tragedy would not have occurred. (Plaintiff's Response, ECF No. 124 at 8; Plaintiff's Sur-reply, ECF No. 138 at 1). Likewise, the failure to administer a field sobriety or portable blood alcohol test to Wadsworth before entrusting Hall to his custody are omissions, along with the failure to impound his unregistered vehicle and the failure to allow Hall "to sleep it off" in his car at the Tinkey residence.

In sum, Plaintiff has stated only three affirmative acts by the LVPD Officers: informing Hall where his truck was located[7]; returning Hall's keys; and detaining him rather than arresting

---

[7] Importantly, the record reflects that at the time Patrolman Kokoska moved Hall's GMC truck to Barb's Country Store, he needed a ride back to Tinkey's to pick up his patrol car. (Kokoska Dep., ECF No, 122-1 at 2082, 2101, p. 55, 74). At this time, Officers Barber and Sherer were called away to another "domestic." (Sherer Dep., ECF No. 122-1 at 771, p.69; Kokoska Dep., ECF No. 122-1 at 2086, p. 59). That left only Dorazio, with Hall in the back of

him. Hence, the remaining question is whether these acts created a danger to Hall or rendered him more vulnerable to danger than if they did not occur.

First, Wadsworth stated unequivocally that he would take Hall to his (Wadsworth's) home and not permit him to return to his truck. (ECF Nos. 121 & 133 ¶ 67). Dorazio and Barber had Wadsworth's assurances that Hall would not be returning to his vehicle that evening. (*Id.*). Dorazio and Barber spoke with Wadsworth and had the opportunity to observe his demeanor. (Barber Dep., ECF No. 122-1 at 999-1000, pp. 107-08; Dorazio Dep., ECF No. 122-1 at 589-90, pp. 140-141). Both Officers testified that nothing in Wadsworth's speech or behavior indicated that he was impaired such that they could not entrust Hall to his care. (*Id.*). Even though Hall knew where his truck was located, and had access to his keys, these affirmative acts by the Officers did not create a danger to Hall or render him more vulnerable to the danger. It was Wadsworth's intervening, unforeseeable actions in returning Hall to his truck that created the danger to Hall, along with Hall's decision to drive his vehicle while intoxicated. Finally, the affirmative act of detaining Hall kept him safely within the confines of the police vehicle for a period of time. This affirmative act by the LVPD Officers prevented Hall from hurting himself or others when the Officers first came upon him at the Tinkey residence. These three affirmative actions played no part in the creation or enhancement of danger to Hall. Viewing all facts and drawing all inferences in the light most favorable to Plaintiff, he is unable to establish the fourth element of the state-created danger analysis.

---

his police vehicle, to drive to Barb's Country Store to pick up Kokoska so he could retrieve his patrol car at Tinkey's. (Kokoska Dep., ECF No. 122-1 at 2105, p. 78). Hall may have seen where his truck was located when he and Dorazio picked up Kokoska at Barb's Country Store. Dorazio testified that he informed Hall where his vehicle was located and told him to pick it up the next day with Wadsworth. (Dorazio Dep., ECF No. 122-1 at 600, p. 151).

Consequently, because the undisputed facts of record do not support Plaintiff's claim for state-created danger as to elements 1, 2, and 4, summary judgment will be granted in favor of the LVPD Officers in their individual capacities at Count I of the Amended Complaint.[8]

B.  Claim Against the Ligonier Valley Police Department and Defendants Dorazio and Scherer in Their Official Capacities[9]

The law is clear that police departments are not proper defendants to a § 1983 action.  *See Martin v. Red Lion Police Dep't,* 146 F. App'x 558, 562 n.3 (3d Cir. 2005) (*per curiam*) (stating that police department is not a proper defendant in an action pursuant to 42 U.S.C. § 1983 because it is a sub-division of its municipality); *Novitsky v. City of Hazelton Police Dep't,* Civil No. 3:22-cv-492, 2023 WL 8172416, at *3 (M.D. Pa. Nov. 2, 2023) (quoting *Dortch v. York Cnty. Child. & Youth,* No. 1:17-cv-1703, 2017 WL 11768643, at *6 (M.D. Pa. Sept. 22, 2017)), *report and recommendation adopted,* No. 1:17-cv-1703, 2017 WL 11773157 (M.D. Pa. Oct. 11, 2017) ("[I]t has been repeatedly held that a police department is not a "person" for purposes of § 1983 and, therefore, is not a proper defendant in a § 1983 action) (collecting cases); *Williams v. North Catasauqua Police Dep't.,* Civil Action No. 23-cv-2605, 2023 WL 6164417, at *2 (E.D. Pa. Sept. 21, 2023).  Therefore, as a matter of law, summary judgment is appropriate as to the LVPD and the LVPD Officers Dorazio and Scherer in their official capacities.

Finally, even if the appropriate municipal entity had been named as a party defendant, the claim against the entity and its Officers in their official capacities would fail because the undisputed facts establish that Hall's constitutional rights were not violated.  Without a violation of Hall's Fourteenth Amendment due process rights pursuant to the state-created danger theory,

---

[8] In light of Plaintiff's failure to raise an issue of material fact as to these elements, the Court need not reach the third element.

[9] Actions brought against § 1983 defendants in their official capacities are really actions against the entity of which an officer is an agent.  *Hafer v. Melo,* 502 U.S. 21, 25 (1991).  Hence, the official capacity claims against Sherer and Dorazio are really claims against the entity that employed them.

the derivative claim for municipal liability cannot survive. *See Morency v. City of Allentown,* No. 5:19-cv-5304, 2020 WL 5868407, at *14 (E.D. Pa. Oct. 2, 2020) (citing *Lansberry v. Altoona Area Sch. Dist.*, 356 F. Supp. 3d 486, 497 (W.D. Pa. 2018) ("[T]he requirement of an underlying constitutional violation is implicit in the Third Circuit's *Monell* framework.")).

Therefore, summary judgment in favor of the LVPD and the LVPD Officers in their official capacities as to Count I of the Amended Complaint will be granted.

C. Section 1983 Conspiracy/State-Created Danger Claim Against Kokoska

Count II of the Amended Complaint names Kokoska only. Plaintiff alleges the following:

> Kokoska is not a state official. However, it is averred that Kokoska acted under color of state law by conspiring with one or more state officials to deprive Hall of his federal constitutional rights. Specifically, Kokoska acted in concert with LVPD, Sherer and/or Dorazio to expose Hall to a state-created danger, thereby depriving Hall of his constitutional rights, and engaged in at least one act in furtherance of the conspiracy . . . .

(Amended Compl., ECF No. 64 ¶ 15). Plaintiff argues that the following acts taken in concert with the LVPD Officers, along with numerous omissions,[10] exposed Hall to a state-created danger: 1) moving Hall's vehicle; 2) following Wadsworth's truck; and 3) pursuing Hall at a high rate of speed while actively radioing Hall's location to LVPD Officers. (Plaintiff's Resp. Brief, ECF No. 132 at 9-14).

To establish a claim pursuant to § 1983, "a plaintiff . . . must show that the alleged [constitutional] deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48 (1988). "The color of state law analysis . . . is grounded in a basic and clear requirement, that the defendant in a § 1983 action has exercised power possessed by virtue

---

[10] These omissions include failing to arrest Hall rather than detain him; failure to impound his vehicle; the failure to keep Hall's keys out of his possession; and failure to investigate Wadsworth's sobriety. (Plaintiff's Resp. Brief, ECF No. 132 at 11, 13).

of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (footnote and internal quotation marks omitted). Generally, this requirement excludes conduct by private parties. But when a private party conspires with a public official to violate a plaintiff's constitutional rights, the private party's conduct is committed under color of state law. "[A] private party involved in such a conspiracy, even though not an official of the State, can be liable under § 1983. . . . . It is enough that the [private party] is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970). Here, viewing all facts and drawing all inferences in the light most favorable to Plaintiff, the Court assumes that Kokoska was a state actor for purposes of the Court's analysis of Count II of the Amended Complaint.

In conjunction with establishing that Kokoska was a willful participant with the State or its agents, Plaintiff must also show the elements of a conspiracy. "A civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means or for an unlawful purpose." *Ammlung v. City of Chester,* 494 F.2d 811, 814 (3d Cir. 1974). *See also Panayotides v. Rabenold*, 35 F. Supp. 2d 411, 419 (E.D. Pa. 1999). A plaintiff must come forward with evidence "from which a conspiratorial agreement can be inferred." *Great Western Mining & Mineral Co. v. Fox Rothschild LLP,* 615 F.3d 159, 175-76 (3d Cir. 2010). "It is not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997). There must be a showing that the alleged conspirators "directed themselves toward an unconstitutional action by virtue of a mutual understanding or agreement." *Chicarelli v. Plymouth Garden Apartments*, 551 F. Supp. 532, 539 (E.D. Pa. 1982) (citing *Tarkowski v. Bartlett Realty Co.*, 644 F.2d 1204 (7th Cir. 1980)).

While Plaintiff attempts to establish an overarching conspiracy among the LVPD Officers and Kokoska, claiming that they acted in concert at various times and at various locations so as to interfere with Hall's Fourteenth Amendment due process rights, Plaintiff does not direct the Court to facts that suggest a preceding agreement to this end. There is no record evidence that Kokoska, together with the LVPD Officers, plotted, planned, or conspired together to carry out the chain of events which lead to Donald Hall's accident. In fact, the record is clear that Kokoska was on scene to only assist the LVPD Officers. He had no authority to direct or participate in any decision-making of the LVPD Officers. (Sherer Dep., ECF No. 122-1 at 834, 836-37, pp. 132, 134-35). If he did attempt to inject himself into the decision-making process, Officer Sherer testified that he would have been told to "stay in his lane." (*Id.* at 837, p. 135). Instead, Kokoska was acting with limited authority as a private patrolman paid by the Loyalhanna Association to protect its paying members. (Kokoska Dep., ECF No. 122-1 at 2068, p. 41) ("We only have rights or duties on contributors' properties."). He had no formalized training to be a police officer, such as MPOETC training. (*Id.* at 2162, p. 135). Nor did he possess Act 120 certification. (*Id.*). He was simply assisting the LVPD Officers because they were "short-handed." (*Id.* at 2083, 2094, pp. 56, 67) ("We are just kind of there to back them up if they need help.").

Accordingly, Kokoska was not involved in the decision to give over custody to Wadsworth. He overheard the conversation between Dorazio, Sherer and Barber when they decided to release Hall to a friend. (Kokoska Dep., ECF No. 122-1 at 2083, p. 56).) But, the LVPD Officers directed no conversation to Kokoska. (*Id.* at 2084, p. 57). Moreover, he was not involved in the transfer of Hall from Dorazio's vehicle to Wadsworth's. He only heard, via a radio transmission, that Hall was "dropped off" to a white Tundra truck. (*Id.* at 2113, p. 86).

24

Relatedly, after Dorazio dropped Kokoska at Tinkey's residence to retrieve his Loyalhanna patrol vehicle, Kokoska resumed his patrol duties. (*Id.* at 2106, 2109, pp. 79, 82). He noticed a white Tundra truck heading in the direction of Barb's Country Store, where he knew Hall's truck was parked. He then pulled into a church parking lot, positioning himself so he had a view of the country store parking lot. (*Id.* at 2114-15, 2121-22, pp. 87-88, 94-95). He saw the white Tundra truck near the black GMC. (*Id.* at 2122, p. 95). Out of concern for Hall's safety, Kokoska radioed in to the LVPD that the white Tundra was at the country store. (*Id.* at 2122-23, pp. 95-96). When he observed the GMC truck leaving the country store parking lot, Kokoska testified that because he is not a police officer, he was not authorized to turn on his patrol vehicle lights or stop Hall from getting into his vehicle, and if he had, he could be charged for impersonating a police officer. (*Id.* at 2172-73, pp. 145-46). He was solely authorized to notify the local police, which he did "multiple times." (*Id.* at 2173, p. 146). These alleged omissions cannot satisfy element four of the state-created danger test.

Thereafter, he pulled out of the church area after Hall made a left turn so he could keep the LVPD Officers updated as to Hall's location. (*Id.* at 2142-43, pp. 115-116). Kokoska followed in Hall's general direction but did not "have direct eyesight of the path of travel of Mr. Hall's vehicle." (*Id.* at 2144, p. 117). His next contact with Hall or his vehicle was when Kokoska ran over some debris in the road, which turned out to be a truck wheel. (*Id.* at 2144-45, pp. 117-18). It was then that Kokoska came upon the accident scene involving Hall. Citing to the deposition testimony of Chief Berger of the LVPD, Plaintiff contends that Kokoska was chasing Hall's vehicle, which could have contributed to Hall's excessive speed and subsequent crash. (Plaintiff's Resp. Brief, ECF No. 132 at 13). Berger's deposition, however, does not support Plaintiff's argument:

Q.  You had mentioned before that you received information from the GPS on that vehicle, on the Kokoska vehicle?

A.  Yes.

Q.  What information was included with the GPS report?

A.  He was going up Rector Road towards 711 the same direction of travel as Mr. Hall.  His speeds were well over the posted speed limit.

Q.  So, knowing that his speeds were well over the posted speed limit, does that suggest what activity was occurring?

 Ms. Collura:  Object to the form.

 The Witness:  I can only say my opinion.  I mean, I don't know what was going through his head.  I assume that he was following that vehicle.

By Mr. Gaydos:

Q.  Chasing him?

A.  I can't say chasing.

(Berger Dep., ECF No. 122-1 at 1192, p. 51).  At best, the record reflects that he was following him, albeit well over the 35-mile per hour speed limit,[11] to keep the LVPD Officers apprised of Hall's location.  (Kokoska Dep, ECF No. 122-1 at 2142-44, pp. 115-117); (Berger Dep., ECF No. 122-1 at 1193, p. 52).

Because Plaintiff has failed to offer any evidence suggestive of a conspiracy, or that Kokoska created a danger to Hall or made him more vulnerable to the danger, Defendant Kokoska is entitled to summary judgment on Count II of the Amended Complaint for conspiracy/state-created danger.

---

[11] Chief Berger testified that GPS showed Kokoska travelling "well above" the posted speed limit of 35 mph.  (Berger Dep., ECF No. 122-1 at 1193, p. 52).

Moreover, like municipal liability, conspiracy to violate one's constitutional rights pursuant to § 1983 is a derivative action that cannot exist without an underlying constitutional violation. *Rosembert v. Borough of E. Lansdowne,* 14 F. Supp. 3d 631, 647 (E.D. Pa. 2014) ("In order to state a claim for conspiracy under section 1983, 'a plaintiff must establish (1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy.'") (quoting *Gale v. Storti,* 608 F. Supp. 2d 629, 635 (E.D. Pa. 2009)), *cited in Morency,* 2020 WL 5868407, at *14. As discussed, *supra,* at Part V.A.1 through 3, the LVPD Officers did not violate Plaintiff's Fourteenth Amendment due process rights. Consequently, Kokoska cannot be liable in conspiracy to violate those rights. *See Morency,* 2020 WL 5868407, at *14. For these additional reasons, summary judgment must be granted as to Count II of the Amended Complaint against Kokoska for conspiracy/state-created danger.

D. <u>All Remaining Supplemental State Law Claims</u>

Pursuant to the provisions of 28 U.S.C. § 1367(c)(3), a district court may "decline to exercise supplemental jurisdiction over a [state law] claim . . . if [it] has dismissed all claims over which it has original jurisdiction . . . ." *See Kach v. Hose,* 589 F.3d 626, 650 (3d Cir. 2009). In fact, the United States Court of Appeals for the Third Circuit recently reiterated that district courts "'*must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Barraclough v. Animal Friends, Inc.*, No. 23-3157, 2024 WL 4867068, at *3 (3d Cir. Nov. 22, 2024) (quoting *Hedges v. Musco*, 204 F.3d 780, 788 (3d Cir. 2000) (emphasis added by *Barraclough* court) (other citation omitted)).

Because summary judgment will be granted on the federal claims in Count I and Count II of the Amended Complaint, the Court will decline to exercise its supplemental jurisdiction as to

the remaining state law claims in Counts III through IX because it finds no factor favoring retaining jurisdiction of these claims.  Pursuant to 28 U.S.C. § 1367(d), Plaintiff will have 30 days after the entry of the accompanying Order to refile the state law claims in state court, unless state law provides for a longer tolling period.  *See* 28 U.S.C. § 1367(d).

## VI.  CONCLUSION

In conclusion, Plaintiff has failed to come forward with an issue of material fact that Defendants LVPD, and Officers Dorazio and Scherer violated Donald Hall's Fourteenth Amendment due process rights pursuant to the theory of state-created danger.  Summary judgment will be granted as to Count I of the Amended Complaint.  Summary judgment will be denied, without prejudice, as to the state law claims against Dorazio and Sherer for false imprisonment and trespass to chattel in Counts III and IV, respectively.  (ECF No. 117).

Similarly, Plaintiff has failed to come forward with an issue of material fact that Defendant Kokoska participated in a conspiracy to violate Hall's Fourteenth Amendment due process rights pursuant to the theory of state-created danger.  Therefore, summary judgment will be granted as to Count II of the Amended Complaint.  Summary judgment will be denied, without prejudice, as to Counts IV and V against Kokoska for trespass to chattel and negligence, respectively.  Further, summary judgment will be denied, without prejudice, as to Count VI against Loyalhanna Association, Inc. for *respondeat superior* liability. (ECF No. 113).

The Motion for Summary Judgment filed by Ligonier Lanes will be denied, without prejudice, as to Count VIII for negligence, and as to Count IX for Dramshop liability.  (ECF No. 119).

Finally, the Court will dismiss the state law negligence claim at Count VII against Defendant Wadsworth, without prejudice to refiling in state court, pursuant to 28 U.S.C. § 1367(c)(3).

Appropriate Orders follow.

Dated:  February 20, 2025

*s/Nora Barry Fischer*
Nora Barry Fischer
Senior U.S. District Judge

cc/ecf:  All counsel of record